OPINION
 

 Per Curiam:
 

 In Desimone v. State, 111 Nev. 1221, 904 P.2d 1 (1995)
 
 (Desimone
 
 /), this court held that appellant Corky Desimone’s criminal conviction of one count of possession of a trafficking quantity of a controlled substance constituted successive punishment in violation of the Double Jeopardy Clause of the United States Constitution.
 
 See
 
 U.S. Const. amend. V. The United States Supreme Court thereafter vacated our decision and remanded the matter to this court with instructions to reconsider in light of
 
 *197
 
 United States v. Ursery, 518 U.S. 267 (1996).
 
 See
 
 Nevada v. Desimone, 518 U.S. 1030 (1996).
 

 Having reconsidered our prior decision in light of
 
 Ursery,
 
 as well as the Supreme Court’s subsequent holding in Hudson v. United States, 522 U.S. 93 (1997), we again conclude that Desimone’s criminal conviction violates the Double Jeopardy Clause of the United States Constitution and must be vacated.
 

 FACTS
 

 Desimone was arrested and charged with possession and sale of methamphetamine after he provided three ounces of the substance to undercover police officers in exchange for what he believed to be stolen property. Following his arrest, the Nevada Department of Taxation initiated proceedings to collect $166,000 in unpaid taxes and penalties pursuant to NRS chapter 372A, Nevada’s Tax on Controlled Substances Act (CSA). On May 20, 1993, the district court entered a civil judgment in the tax proceeding in favor of the Department and against Desimone in the amount of $166,000.
 
 Desimone I,
 
 111 Nev. at 1223-24, 904 P.2d at 2-3.
 

 Thereafter, on September 22, 1993, the district court convicted Desimone in the separate criminal proceeding of one count of possession of a trafficking quantity of a controlled substance. The district court sentenced him to serve a term of fifteen years in the Nevada State Prison and to pay a fine of $100,000.
 
 Id.
 
 On appeal, a majority of this court concluded that the taxes and penalties assessed under the CSA constituted “punishment for double jeopardy purposes.”
 
 Desimone I,
 
 111 Nev. at 1228, 904 P.2d at 6. Because the tax against Desimone had been reduced to judgment before the judgment of conviction was entered, this court held that his subsequent criminal conviction constituted impermissible successive punishment under the Double Jeopardy Clause.
 
 Desimone I,
 
 111 Nev. at 1230, 904 P.2d at 6-7.
 

 As noted, the United States Supreme Court subsequently vacated this court’s decision and remanded the matter for reconsideration in light of United States v. Ursery, 518 U.S. 267 (1996).
 
 See
 
 Nevada v. Desimone, 518 U.S. 1030 (1996).
 

 DISCUSSION
 

 Relevant Supreme Court decisions
 

 This court’s decision in
 
 Desimone I
 
 primarily adhered to the analytical approach delineated by the United States Supreme Court in Department of Revenue of Mont. v. Kurth Ranch, 511 U.S. 767 (1994).
 
 Kurth Ranch
 
 addressed whether a Montana tax assessed on marijuana was invalid as successive punishment under the Double Jeopardy Clause where the taxpayers had already been
 
 *198
 
 criminally convicted of owning the marijuana that was taxed. The Court held that the Montana tax proceeding ‘ ‘was the functional equivalent of a successive criminal prosecution that placed the [taxpayers] in jeopardy a second time ‘for the same offense.’ ”
 
 Kurth Ranch,
 
 511 U.S. at 784.
 

 After this court decided
 
 Desimone I,
 
 the Supreme Court issued two decisions significantly clarifying the proper analysis for determining whether a civil forfeiture or penalty constitutes punishment for double jeopardy purposes.
 
 See
 
 United States v. Ursery, 518 U.S. 267 (1996) (addressing civil
 
 in rem
 
 forfeiture proceedings); Hudson v. United States, 522 U.S. 93 (1997) (addressing administrative proceedings involving imposition of monetary penalties and occupational debarment).
 

 In
 
 Hudson,
 
 the Court largely disavowed the double jeopardy analysis previously announced in United States v. Halper, 490 U.S. 435 (1989).
 
 [2]
 
 Instead,
 
 Hudson
 
 articulated a two-part test, previously outlined in
 
 Ursery,
 
 for determining whether a particular punishment is criminal or civil. This court has since adopted and applied the
 
 Ursery
 
 and
 
 Hudson
 
 analysis in examining double jeopardy concerns in cases involving civil forfeitures and administrative penalties.
 
 See
 
 Levingston v. Washoe County, 114 Nev. 306, 956 P.2d 84 (1998) (applying
 
 Ursery
 
 analysis in forfeiture context); State v. Lomas, 114 Nev. 313, 955 P.2d 678 (1998) (applying
 
 Hudson
 
 analysis in civil driver’s license revocation proceedings).
 

 As
 
 Hudson
 
 instructs, in assessing the double jeopardy implications of a civil sanction, we look first to whether the legislature intended the provision in question to be civil or criminal in nature.
 
 Hudson,
 
 522 U.S. at 99 (first question is whether the legislature ‘ ‘ ‘indicated either expressly or impliedly a preference for one label or the other’ ’ ’) (quoting United States v. Ward, 448 U.S. 242, 248 (1980)). Second, even in those cases where the legislature has indicated an intention to establish a civil mechanism, this court must inquire further into whether the statutory scheme is so punitive either in purpose or effect, “as to ‘transform] what was clearly intended as a civil remedy into a criminal penalty.’ ”
 
 Hudson,
 
 522 U.S. at 99 (quoting Rex Trailer Co. v. United States, 350 U.S. 148, 154 (1956));
 
 see also Ursery,
 
 518 U.S. at 288 (court must first look to whether Congress intended the provision to be civil or criminal and then to whether the proceedings are so punitive in fact as to persuade the court that they may not legitimately be viewed as civil in nature despite
 
 *199
 
 Congress’ intent) (citing United States v. One Assortment of 89 Firearms, 465 U.S. 354, 366 (1984)).
 

 Hudson
 
 explains:
 

 In making this latter determination, the factors listed in
 
 Kennedy v. Mendoza-Martinez,
 
 372 U.S. 144, 168-69 (1963), provide useful guideposts, including: (1) “[w]hether the sanction involves an affirmative disability or restraint”; (2) “whether it has historically been regarded as a punishment”; (3) “whether it comes into play only on a finding of scienter”; (4) “whether its operation will promote the traditional aims of punishment—retribution and deterrence”; (5) “whether the behavior to which it applies is already a crime”; (6) “whether an alternative purpose to which it may rationally be connected is assignable for it”; and (7) “whether it appears excessive in relation to the alternative purpose assigned.”
 

 Id.
 
 at 99-100.
 
 Hudson
 
 emphasizes that these “Kennedy” factors must be considered “in relation to the statute on its face,” and “only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.”
 
 Id.
 
 (internal quotation marks and citations omitted).
 

 Neither
 
 Ursery
 
 nor
 
 Hudson
 
 specifically call into question the holding or double jeopardy analysis applied in
 
 Kurth Ranch
 
 in the tax context.
 
 See, e.g.,
 
 Commissioner of Revenue v. Mullins, 702 N.E.2d 1, 4 (Mass. 1998) (“nothing in the Court’s
 
 Hudson
 
 decision indicates that the mode of examination employed in
 
 Kurth Ranch
 
 is no longer appropriate in the tax context”). In fact, both opinions appear to acknowledge that the
 
 Kurth Ranch
 
 analysis encompasses at least to some extent the two-part test of
 
 Hudson
 
 and
 
 Ursery. Id.
 
 Nonetheless,
 
 Ursery
 
 and
 
 Hudson
 
 both highlight the key, determinative factors that persuaded the Court in
 
 Kurth Ranch
 
 to conclude that the Montana tax at issue implicated double jeopardy concerns.
 

 For example, in summarizing the
 
 Kurth Ranch
 
 analysis, the
 
 Ursery
 
 Court explained:
 

 We first established that the fact that. Montana had labeled the civil sanction a “tax” did not end our analysis. We then turned to consider whether the tax was so punitive as to constitute a punishment subject to the Double Jeopardy Clause. Several differences between the marijuana tax imposed by Montana and the typical revenue-raising tax were readily apparent. The Montana tax was unique in that it was conditioned on the commission of a crime and was imposed only after the taxpayer had been arrested: Thus, only a person
 
 *200
 
 charged with a criminal offense was subject to the tax. We also noted that the taxpayer did not own or possess the taxed marijuana at the time that the tax was imposed. From these differences, we determined that the tax was motivated by a “penal and prohibitory intent rather than the gathering of revenue.” Concluding that the Montana tax proceeding “was the functional equivalent of a successive criminal prosecution,” we affirmed the Court of Appeals’ judgment barring the tax.
 

 Ursery,
 
 518 U.S. at 282 (quoting
 
 Kurth Ranch,
 
 511 U.S. at 781, 784) (internal citations omitted).
 
 Ursery
 
 further explained:
 

 [Kurth
 
 Ranch] expressly disclaimed reliance upon
 
 Halper,
 
 finding that its case-specific approach was impossible to apply outside the context of a fixed civil-penalty provision. Reviewing the Montana marijuana tax, we held that because ‘ ‘tax statutes serve a purpose quite different from civil penalties, . . .
 
 Halper’s
 
 method of determining whether the exaction was remedial or punitive simply does not work in the case of a tax statute.”
 

 Ursery,
 
 518 U.S. at 285-86 (quoting
 
 Kurth Ranch,
 
 511 U.S. at 784).
 
 [3]
 

 The Court’s subsequent decision in
 
 Hudson
 
 also distinguished
 
 Kurth Ranch
 
 from
 
 Halper,
 
 emphasizing with approval
 
 Kurth Ranch’s
 
 recognition that all civil penalties have some deterrent effect, and that “the presence of a deterrent purpose or effect is not dispositive of the double jeopardy question.”
 
 Hudson, 522
 
 U.S. at 102 n.6 (quoting
 
 Kurth Ranch,
 
 511 U.S. at 781).
 
 [4]
 
 The
 
 *201
 
 Court also noted that unlike the
 
 Halper
 
 decision,
 
 Kurth Ranch
 
 “applied a Kennedy-like test, before concluding that Montana’s dangerous drug tax was ‘the functional equivalent of a successive criminal prosecution.’ ”
 
 Hudson,
 
 522 U.S. at 102 n.6 (internal citations omitted).
 

 Finally, Justice Breyer’s concurrence in
 
 Hudson
 
 further identified and defined factors considered in
 
 Kurth Ranch
 
 in assessing the double jeopardy implications of the Montana tax.
 
 See Hudson,
 
 522 U.S. at 115 (Breyer, J., concurring). Justice Breyer explained,
 
 Kurth Ranch
 
 properly tracked the following “nonexclusive list of factors set forth in
 
 Kennedy
 

 [The Montana] tax was “remarkably high”; it had “an obvious deterrent purpose”; it was “conditioned on the commission of a crime”; it was “exacted only after the taxpayer ha[d] been arrested for the precise conduct that gives rise to the tax obligation”; its alternative function of raising revenue could be equally well served by increasing the fine imposed on the activity; and it departed radically from “normal revenue laws” by taxing contraband goods perhaps destroyed before the tax was imposed.
 

 Hudson,
 
 522 U.S. at 115 (Breyer, J., concurring) (quoting
 
 Kurth Ranch,
 
 511 U.S. at 781-84).
 

 With the above-stated principles in mind, we now reconsider whether Desimone’s criminal conviction constituted impermissible successive punishment under the Double Jeopardy Clause. In so doing, we first assess whether the legislature intended the CSA, either expressly or impliedly, to be civil or criminal in nature. Second, even assuming that the legislature intended the provision to be civil in nature, we next consider whether the $166,000 tax judgment imposed in this case pursuant to the CSA is so punitive in purpose or effect as to constitute punishment subject to the Double Jeopardy Clause. In making this latter determination, we have paid due regard to the
 
 “Kennedy-like”
 
 factors identified above in
 
 Kurth Ranch, Ursery,
 
 and
 
 Hudson.
 

 Legislative intent
 

 As
 
 Hudson
 
 and
 
 Ursery
 
 instruct, any assessment of whether an exaction is civil or criminal in character should begin with an analysis of legislative intent. In the instant case, several factors are indicative of the legislature’s intent to enact a civil provision. First, the CSA is quite clearly labeled a “tax.”
 
 See
 
 NRS chapter 372A (entitled: “Tax on Controlled Substances”). Second, the penalties assessed for failure to register and pay the tax are specifically denominated as “civil” and must be collected “as part of
 
 *202
 
 the tax.”
 
 See
 
 NRS 372A.070(4). Third, NRS 372A.050 confers authority upon the Nevada Department of Taxation to “adopt all necessary regulations to carry out the provisions of this chapter.” As we have previously observed, the legislature’s decision to confer such authority on an administrative agency is prima facie evidence that the legislature intended to provide for a civil sanction.
 
 [5]
 

 See Lomas,
 
 114 Nev. at 317, 955 P.2d at 680-81 (citing
 
 Hudson,
 
 522 U.S. at 103). Accordingly, for the purposes of this analysis, we discern from the face of the CSA itself a legislative preference to label the CSA as essentially civil in nature.
 

 This alone, however, does not immunize the provision from double jeopardy scrutiny.
 
 See
 
 Lynn v. West, 134 F.3d 582, 589 n.5 (4th Cir.)
 
 (Kurth Ranch
 
 dictates that the tax be analyzed according to its substantive effect, not its formal label),
 
 cert. denied,
 
 525 U.S. 813 (1998). Therefore, we now turn to consider whether the characteristics of the statutory scheme are so punitive in effect as to subject the provision to the constraints of the Double Jeopardy Clause.
 

 Punitive characteristics and effects
 

 We note initially that the Nevada CSA is exclusively applicable only to illegal activities, and the “behavior to which it applies is already a crime.”
 
 See Hudson,
 
 522 U.S. at 99 (quoting
 
 Kennedy,
 
 372 U.S. at 168). For example, the preamble to the CSA describes the provision as:
 

 AN ACT relating to controlled substances; requiring illegal dealers in controlled substances to register with the department of taxation; imposing a tax on illegally sold controlled substances; providing for the confidentiality of certain information submitted by dealers; providing a penalty; and providing other matters properly relating thereto.
 

 See
 
 1987 Nev. Stat., ch. 717, at 1737. Moreover, any person lawfully in possession of a controlled substance is specifically exempted from the tax.
 
 See
 
 NRS 372A.060(1). Thus, as in
 
 Kurth Ranch,
 
 Nevada’s tax in substantive and practical effect is “conditioned on the commission of a crime.”
 
 Ursery,
 
 518 U.S. at 282. As the Supreme Court has observed, this is “significant of penal and prohibitory intent.”
 
 Kurth Ranch,
 
 511 U.S. at 781 (quoting United States v. Constantine, 296 U.S. 287, 295 (1935)).
 

 Unlike the Montana tax at issue in
 
 Kurth Ranch,
 
 however, the
 
 *203
 
 Nevada tax is due and payable prior to or upon the occurrence of the taxable activity, rather than upon an arrest for that activity. Under Nevada’s CSA, a dealer must purchase and affix revenue stamps to all illegal drugs the dealer sells. NAC 372A.020. Thus, theoretically at least, the Nevada tax is not necessarily exacted only after the taxpayer has been arrested for the conduct giving rise to the tax obligation. Rather, the tax is broadly applicable to any person who unlawfully sells, offers to sell, or possesses with the intent to sell a controlled substance.
 
 See
 
 NRS 372A.070(1).
 

 Further, Nevada’s CSA provides for anonymous payment and specifically precludes use of tax information in criminal prosecutions. Illegal drug dealers are not required to give a name, address, social security number or other identifying information,
 
 see
 
 NRS 372.070(3); information obtained from a dealer who registers or pays the tax is confidential,
 
 see
 
 NRS 372A.080(1); no criminal prosecution may be initiated on the basis of such information,
 
 see
 
 NRS 372A.080(2); and no such information is admissible in a criminal prosecution unless the information was independently or inevitably would have been discovered,
 
 see
 
 NRS 372A.080(3). It is these features which primarily distinguish our state’s statutory scheme from the Montana scheme at issue in
 
 Kurth Ranch.
 

 We recognize that other courts have distinguished
 
 Kurth Ranch
 
 and have rejected double jeopardy challenges to statutory schemes similar to Nevada’s on the basis of these distinctions.
 
 See, e.g.,
 
 Com. v. Bird, 979 S.W.2d 915 (Ky. 1998),
 
 cert. denied,
 
 119 S. Ct. 2019 (1999); Covelli v. Commissioner of Revenue Servs., 668 A.2d 699 (Conn. 1995),
 
 vacated and remanded,
 
 518 U.S. 1031,
 
 aff’d after remand,
 
 683 A.2d 737 (Conn. 1996),
 
 cert. denied,
 
 520 U.S. 1174 (1997); Milner v. State, 658 So. 2d 500 (Ala. Civ. App. 1994); State v. Lange, 531 N.W.2d 108 (Iowa 1995); State v. Gulledge, 896 P.2d 378 (Kan. 1995); McMullin v. South Carolina Dept, of Rev. & Taxation, 469 S.E.2d 600 (S.C. 1996). We conclude, however, that such constitutional distinctions based on the pretense that dealers may prepay taxes are unpersuasive and elevate form over substance and practicality.
 

 As a practical matter, it will be the rare circumstance indeed where a dealer in illegal drugs will register and tender prior payment of taxes due under Nevada’s CSA, particularly where, as here, the high rate of taxation appears even more remarkable than that assessed against the
 
 Kurth Ranch
 
 taxpayers.
 
 [6]
 
 As Chief Justice
 
 *204
 
 Rehnquist noted in his dissent in
 
 Kurth Ranch:
 
 “Because the activity sought to be taxed is illegal, individuals cannot be expected to voluntarily identify themselves as subject to the tax.’ ’
 
 Kurth Ranch,
 
 511 U.S. at 788 n.2 (Rehnquist, C. J., dissenting). We are not persuaded that these essentially illusory, anonymous payment provisions constitute credible constitutional bases for distinguishing Nevada’s CSA from the provision addressed in
 
 Kurth Ranch.
 

 Instead, we conclude that the similarities between Nevada’s tax and the
 
 Kurth Ranch
 
 tax are more compelling than the differences. We agree with those courts that expressly or implicitly recognize that, realistically, imposition of a tax like Nevada’s will follow only after a dealer is apprehended and subject to arrest and that double jeopardy concerns are indeed implicated where such taxation is expressly limited to the unlawful drug activity.
 
 See, e.g.,
 
 Lynn v. West, 134 F.3d 582 (4th Cir.) (finding drug tax punitive although double jeopardy question not at issue),
 
 cert. denied,
 
 525 U.S. 813 (1998); Commissioner of Revenue v. Mullins, 702 N.E.2d 1 (Mass. 1998) (holding that revenue stamp tax on controlled substances is punishment for double jeopardy purposes); Brunner v. Collection Div. of Tax Com’n, 945 P.2d 687 (Utah 1997) (same); Wilson v. Department of Revenue, 662 N.E.2d 415 (Ill. 1996) (same); Bryant v. State, 660 N.E.2d 290 (Ind. 1995) (Indiana controlled substance tax constitutes punishment for double jeopardy purposes),
 
 cert. denied,
 
 519 U.S. 926 (1996);
 
 see also
 
 People v. Maurello, 932 P.2d 851 (Colo. Ct. App. 1997) (addressing double jeopardy concerns of Colorado drug tax that did not contain confidentiality or anonymity provisions and that did not prohibit use of drug information in criminal prosecution). Thus, we conclude that, as in
 
 Kurth Ranch,
 
 Nevada’s CSA hinges on the commission of a crime and realistically, will normally be exacted only after the taxpayer is apprehended and subject to arrest for the same conduct giving rise to the tax obligation.
 

 We have assessed the remaining factors identified in
 
 Kurth Ranch, TJrsery,
 
 and
 
 Hudson,
 
 and are persuaded by the “clearest proof” that the tax assessed against Desimone was the functional equivalent of a criminal prosecution. First, as noted above, the Nevada tax is at least as high as the tax at issue in
 
 Kurth Ranch.
 
 
 *205
 
 Second, it has an obvious deterrent purpose and clearly “promote^] the traditional aims of punishment-retribution and deterrence.”
 
 [7]
 

 Hudson,
 
 522 U.S. at 99 (quoting
 
 Kennedy,
 
 372 U.S. at 168). Third, “its alternative function of raising revenue could be equally well served by increasing the fine imposed” on illegal drug transactions.
 
 Id.
 
 at 115 (Breyer, J., concurring). Fourth, in light of the exceedingly high taxation rate and the improbability that a taxpayer will possess the contraband goods when the tax and penalties are levied, we conclude that the Nevada tax “depart[s] radically from ‘normal revenue laws.’ ”
 
 Id.
 

 We conclude that, taken as a whole, Nevada’s tax in practice and effect is a “concoction” of the same “anomalies” and unusual features that the Court found in
 
 Kurth Ranch
 
 to be “too far removed in crucial respects from a standard tax assessment to escape characterization as punishment for the purpose of double jeopardy analysis.”
 
 Kurth Ranch,
 
 511 U.S. at 783.
 

 CONCLUSION
 

 We recognize the need for innovative and imaginative approaches in the battle against illegal drug usage, and we emphasize that the State is not constitutionally prohibited from seeking a judgment pursuant to the provisions of Nevada’s CSA where there has been no prior criminal conviction for the conduct giving rise to the tax obligation.
 

 The reality is, however, that drug dealers operating outside the
 
 *206
 
 law will not register and prepay these taxes. We decline to engage in the pretense that the remote possibility they might constitutes a constitutional basis for distinguishing Nevada’s tax from the tax found to implicate double jeopardy concerns in
 
 Kurth Ranch.
 

 The tax imposed against Desimone by a final judgment pursuant to NRS chapter 372A is the functional equivalent of a criminal prosecution. Where, as here, the tax has been reduced to judgment before a criminal judgment of conviction is entered for engaging in the same unlawful conduct, the conviction violates the Double Jeopardy Clause and cannot stand.
 
 See Desimone I,
 
 111 Nev. at 1229-30, 904 P.2d at 6-7 (quoting and discussing United States v. Sanchez-Escareno, 950 F.2d 193 (5th Cir. 1991),
 
 cert. denied,
 
 506 U.S. 841 (1992)). Accordingly, we reverse and vacate Desimone’s criminal conviction.
 

 [2]
 

 Although this court cited
 
 Halper
 
 in
 
 Desimone I,
 
 as noted above, our prior decision was guided primarily by the analysis in
 
 Kurth Ranch.
 

 [3]
 

 This court’s decision in
 
 Desimone I
 
 also acknowledged this instruction from
 
 Kurth Ranch
 
 that the
 
 Halper
 
 approach, could not be applied in the case of a tax provision.
 
 See Desimone I,
 
 111 Nev. at 1231, 904 P.2d at 7 (quoting
 
 Kurth, Ranch,
 
 511 U.S. at 784).
 

 [4]
 

 In
 
 Desimone I,
 
 this court, in dictum, along with many other state and federal courts, broadly construed
 
 Halper
 
 as holding that a civil penalty would be considered punishment for double jeopardy purposes whenever that penalty did not “solely ‘serve a remedial purpose, but rather [could] only be explained as also serving either retributive or deterrent purposes.’ ”
 
 Desimone I,
 
 111 Nev. at 1225, 904 P.2d at 3 (quoting
 
 Halper,
 
 490 U.S. at 448). As we have previously noted, however,
 
 Halper
 
 announced a rule “for the rare case . . . where a fixed-penalty provision subjects a prolific but small-gauge offender to a sanction overwhelmingly disproportionate to the damages he has caused.”
 
 See Lomas,
 
 114 Nev. at 316 n.2, 955 P.2d at 680 n.2 (quoting
 
 Halper,
 
 490 U.S. at 449). In any event, acknowledging the confusion created by
 
 Halper,
 
 the Court concluded in
 
 Hudson
 
 that
 
 “Halper’s
 
 test for determining whether a particular sanction is ‘punitive,’ and thus subject to the strictures of the Double Jeopardy Clause, has proved unworkable.”
 
 Hudson,
 
 522 U.S. at 102. Specifically,
 
 Hudson
 
 explained, “[i]f a sanction must be ‘solely’ remedial
 
 (i.e.,
 
 entirely nondeterent) to avoid implicating the Double Jeopardy Clause, then no civil penalties are beyond the scope of the Clause.”
 
 Id.
 
 at 102.
 

 [5]
 

 Notably, NRS 372A.070(5) also authorizes the district attorney of any county in which a dealer resides to “institute and conduct the prosecution of any action” for failure to register or pay the tax.
 
 See also
 
 NRS 372A.070(1) and (4).
 

 [6]
 

 Nevada’s CSA requires an illegal dealer in controlled substances to register with the Nevada Department of Taxation, pay an annual fee of $250, pay a tax of $100 for each gram of marijuana or portion thereof; $1,000 for each gram of any other controlled substance or portion thereof; and $2,000 for each 50 dosage units or smaller portion of controlled substances not sold by
 
 *204
 
 weight.
 
 See
 
 NRS 372A.070(1). Dealers who ignore the tax are subject to civil penalties of 100% of the tax.
 
 See
 
 NRS 372A.070(4). Thus, realistically, the class of taxpayers will generally be liable for penalties amounting to 100% of the unpaid tax. In contrast, the Montana tax at issue in
 
 Kurth Ranch
 
 was either 10% of the assessed market value of the drugs or a specified amount depending on the drug ($100 per ounce for marijuana).
 
 Kurth Ranch,
 
 511 U.S. at 780 n.17.
 

 [7]
 

 The legislative history of the CSA amply illustrates this point. As we previously noted in
 
 Desimone I:
 

 [T]he sponsor of the bill giving rise to NRS chapter 372A introduced the legislation as serving two purposes: first, to “get the drug dealers where it really hurts—in the pocketbook,” and second, to provide
 
 “a whole new avenue of deterrents and punishment
 
 for drug dealers outside of the fines, sentences and courtroom procedures under current law.”
 

 See Desimone I,
 
 111 Nev. at 1227-28, 904 P.2d at 5 (quoting Minutes of the Senate Taxation Committee, 64th Sess. 1-8, Exhibit C (March 12, 1987) (Senator John M. Vergiels, Introductory Remarks for Senate Bill 144) (emphasis added)). At the very least, this legislative history, coupled with the exceedingly high rate of taxation, is clear evidence supporting “a conclusion that the statute’s primary function is to serve as an additional penalty.”
 
 See Kennedy,
 
 372 U.S. at 169-70. Moreover, these factors come close to the “objective manifestations” of legislative intent that, under
 
 Kennedy,
 
 “indicate conclusively that the provisions in question can only be interpreted as punitive.”
 
 Id.; see also
 
 Stennett v. State, 941 S.W.2d 914, 916-17 (Tex. Crim. App. 1996) (where satisfactory evidence showed that legislature intended controlled substance tax to serve as further punishment, the court held that the tax was punishment subject to constraints of Double Jeopardy Clause),
 
 overruled on other grounds by,
 
 Ex Parte Ward, 964 S.W.2d 617 (Tex. Crim. App.),
 
 cert. denied,
 
 525 U.S. 823 (1998).